















```
KAJ    5/29/01    14:50
3:01-MP-01356   USA V. SVESDA MARU FV
*1*
*CRMP.*
```

# United States District Court

SOUTHERN DISTRICT 08 PM 12:39 CALIFORNIA

**In the Matter of the Search of**
(Name, address or brief deposition of person, property or premises to be searched)

Fishing Vessel "SVESDA MARU", Registered in Belize, 152' ft, White Hull w/ White Trim, Homeport Guayaquil, EU, Callsign 029920145

## APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

CASE NUMBER: '01 MG 1356

I ___Susan Wolf___ being duly sworn depose and say:

I am a(n) __Special Agent, Drug Enforcement Administration__ and have reason to believe

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)
The Belizian Fishing Vessel "SVESDA MARU" Currently in the Possession of the U. S. Marshal's Service San Diego, California, and equipment thereof currently in possession of the U. S. Drug Enforcement Administration, San Diego, California

in the ___SOUTHERN___ District of ___CALIFORNIA___

there is now concealed a certain person or property, namely (describe the person or property to be seized)

(See Attachment A)

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
Contraband and the Means for Committing the Offense

concerning a violation of Title ___46___ United States Code, Section(s) 1903(a), (c)(1)(c), (f) and (j).
The facts to support a finding of Probable Cause are as follows:

(See Attachment B)

Continued on the attached sheet and made a part thereof:  ☒ Yes  ☐ No

SUSAN WOLF
Signature of Affiant

Sworn to before me, and subscribed in my presence,

5/29/01
Date

at SAN DIEGO, CA
City and State

LARRY A. BURNS
U.S. MAGISTRATE JUDGE
Name and Title of Judicial Officer

Signature of Judicial Officer

ATTACHMENT A

DESCRIPTION OF CONCEALED PROPERTY, NAMELY:

1. Equipment used for navigational purposes, including Global Positioning Systems (GPS), Long Range Navigational Equipment (LORAN), and Satellite Navigational Equipment (SATNAV).

2. All documents, information and electronic data relating to positions reached and/or courses taken by the vessel, including logs and charts, electronic data in the form of computer hardware, computer software, radar equipment memory, LORAN equipment memory, SATNAV equipment memory, and GPS equipment memory, in all communication and navigation equipment to include:

```
Furuno       GD-185       Color Plotter              2413-1533
Furuno       FS-1501      SSB Transceiver            5586-1340
Furuno       FS-1503      SSB Transceiver            3513-0473
Furuno       FS-1200      SSB Radio Telephone        533-0564
Furuno       GP-31        GPS                        3426-4989
Furuno       GP-1610C     GPS Plotter                2495-4667
Furuno       FM-2711      VHF/FM Radio Telephone     3510-0558
Furuno       FAX-208A     Facsimile Receiver         80516621-9408
Kenwood      TM-733A      FM Dual Bander             60902654
Panasonic    KX-G2200     VHF Radio Telephone        1LBQB006592
Panasonic    KX-FP200LA   Facsimile                  7IAFA005175
Nera         Saturn M     Inmarsat-M Phone           2808
Nera         Worldphone   Powersupply                00070085
Grundig      Yacht Boy 400   SSB Receiver            No Identifiable SN
JRC Beacon   Emergency Position Indicating Radio Beacon   NO SN
COMSAT Mobile Communications Card (INMARSAT Phone Card)
Furuno       Coastline Data Card  for Mexico and Central America    Stock # J3518
Furuno       Coastline Data Card for Andalucia    Stock # ESP06ET3
Furuno       Coastline Data Card  for Eucuador    Stock # ECU01ES3
Maxell Disk 2000 Point Coastline Data for Eucador       Stock # EC002
Maxell Disk       Unknown                           Stock # JF14-02
Maxell Disk       Unknown                           Unknown
```

3. Communications equipment, including radios, cellular telephones, computers, and facsimilie machines.

4. Equipment used to detect U.S. Coast Guard and U.S. Navy activities and surveillance, including radio scanners and radar detectors.

5. Tracking equipment, including radar, tracking devices and related electronic

or computer equipment.

6. COMPUTER EQUIPMENT/ELECTRONIC EVIDENCE -

(a) Items to be seized as instrumentalities:

(1) Computer hardware is described as any and all computer equipment, including any electronic devices which are capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical, or similar computer impulses or data. These devices include, but are not limited to, any data-processing hardware (such as central processing units and any of the items listed in paragraph 2 above), internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, and other memory storage devices), peripheral input/output devices (such as keyboard, printers, scanners, plotters, video display monitors, and optical readers), and related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices), as well as any devices, mechanisms, or parts that can be used to restrict access to such hardware (such as physical keys and locks) or to ensure that it has an uninteruptable power supply.

(2) Computer software is described as any and all information, including any instructions, programs, or program code, stored in the form of electronic, magnetic optical, or other media which are capable of being interpreted by a computer or it's related components. Computer software may also include certain data, data fragments or control characters integral to the operation of computer software. These items include, but are not limited to, operating system software, applications software, utility programs, compilers, interpreters, communications software, and other programming used or intended for use to communicate with other computer components.

(3) Computer-related documentation is described as any written, recorded, printed or electronically-stored material which explains or illustrates the configuration or use of any seized hardware, software, or related items.

(4) Computer passwords and data security devices are described as all those devices, programs, or data -- whether themselves in the nature of hardware or software that can be used or is designed for use to restrict access to or facilitate concealment of any computer hardware, computer software, computer-related documentation, electronic data, records, documents or materials within the scope of this application. These items include, but are not limited to, any data security hardware (such as any encryption devices, chips and circuit boards), passwords, data security software or information (such as test keys and encryption codes), and similar information that is required to access computer programs or data or to otherwise render programs or data into a useable form.

(5) Based on the probable cause established in Attachment B, the above mentioned computer hardware, software, computer documentation, passwords and data security devices constitute means of committing criminal offenses, and are thus instrumentalities in, as well as evidence of, the violations recited herein. These materials are therefore subject to seizure pursuant to Rule 41 of the Federal Rules of Criminal Procedure, and may be retained as evidence and as instrumentalities used in the commission of a crime for a reasonable period of time and may be examined, analyzed, and tested as evidence and instrumentalities used in the commission of a crime for a reasonable period of time.

b. Items to be seized as evidence.

(1) In addition to its use of its computers as instrumentalities of criminal offenses, I know that the premises to be searched used their computers and related electronic storage devices to collect, store, maintain, retrieve, conceal, transmit, and use electronic data in the form of electronic records, documents, and materials, including those used to facilitate communications. This data may be more fully described as any information stored in the form of electronic, magnetic, optical, or other coding on computer media or on media capable of being read by a computer or computer-related equipment. This media includes, but is not limited to, any fixed disks, external hard disks, removable hard disk cartridges, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, laser disks, or other memory storage devices.

(2) The terms "records, documents, and materials, including those used to facilitate communications" as used above includes all of the foregoing items of evidence in whatever form and by whatever means such records, documents, or materials, their drafts, or their modifications may have been created or stored, including, but not limited to, any handmade form (such as writing, drawing, painting, with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any mechanical form (such as phonograph records, printing, or typing); any electrical, electronic, or magnetic form (such as tape recordings, cassettes, compact discs), or any information on an electronic or magnetic storage device (such as floppy diskettes, hard disks, CD-ROMs, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks), as well as printouts or readouts from any magnetic storage device.

(3) The terms "records, documents, and materials, including those used to facilitate communications" as used above shall also be read to include any and all electronic information or electronic data, store in any form, which is used or has been prepared for use either for periodic or random back-up (whether deliberate or inadvertent, or automatically or manually initiated), of any computer or computer system. The form such information might take includes, but is not limited to, floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, video cassettes, and other media capable of storing magnetic or optical coding.

(4) Such electronic data in the form of electronic records, documents, and materials, including those used to facilitate communications constitutes evidence of the commission of a criminal offense. These materials are therefore subject to seizure pursuant to Rule 41 of the Federal Rules of Criminal Procedure, and the devices used to store or facilitate storage of such materials may be retained as evidence in the commission of a crime for a reasonable period of time and may be examined, analyzed, and tested for a reasonable period of time as evidence in the commission of a crime.

# ATTACHMENT B

I, Susan Wolf, Special Agent, United States Department of Justice, Drug Enforcement Administration, being duly sworn, hereby depose and say:

A. INTRODUCTION:

1. I am a Special Agent with the Drug Enforcement Administration (DEA) assigned to the San Diego Field Division. I have approximately 5 years of law enforcement experience in Southern California. I have been employed by DEA as a Special Agent for approximately five years. Prior to that I was an Intelligence Research Specialist for DEA, for approximately four and a half years.

2. While employed by the DEA, I attended a seventeen-week course at the DEA Academy in Quantico, Virginia. During this course, I have received formal training in the identification of various types of controlled substances by sight and odor, the way in which controlled substances are packaged, marketed, and consumed, and the effects of various drugs on human physiology. I have also received formal training that focused on the transportation and distribution of controlled substances. This training included identification of packaging and concealment techniques used by persons involved in the transportation and distribution of controlled substances.

3. During five years of Southern California Law Enforcement, I have conducted numerous investigations that would be violations of Title 21, and have made numerous arrests for the same. I have participated in many aspects of drug investigations, to include acting as an undercover agent, case agent, being a contact for confidential sources, conducting surveillance, and executing numerous arrest and search warrants.

4. I have talked to individuals who have been involved in the use sales, and the illegal distribution of controlled substances. I have learned from those individuals the techniques commonly used by those involved in the distribution and packaging of controlled substances. I have worked with Cooperating Sources of Information (CSs) and have learned from CSs the ways in which narcotic traffickers operate.

5. Because of my personal participation in this investigation, and because of information provided to me by other agents and officers, I am familiar with the facts and circumstances of this investigation. My experience in investigating drug offenders, my education, my conversations with other drug agents, and my specialized training formed the basis for the opinions and conclusions set forth, below which I drew from the facts set forth herein.

B. VESSEL TO BE SEARCHED:

   I believe that I have probable cause to search:

   The Fishing Vessel "SVESDA MARU", registered in Belize with the call sign 029920145, length: approximately 152 feet, color: white hull with white trim, homeport: Guayaquil, Ecuador; including the items listed in Attachment A.

C. FACTS:

On or about April 28, 2001, a United States Navy (USN) Ship, with United States Coast Guard (USCG) Law Enforcement Detachment (LEDET) #104 were on routine patrol in international waters, approximately 500 nautical miles off of the coast of Acapulco, Mexico. The USCG LEDET #104 conducted a boarding of a Belizian flagged, 152 foot fishing vessel, named "SVESDA MARU". The 'SVESDA MARU" crew claimed that they had been underway since approximately April 21, 2001, on a fishing trip.

The LEDET noted that there was several hundred pounds of small fish (squid etc.) that is commonly used as fishing bait. The bait, however, was frozen solid and did not appear to have been disturbed in some time. There were only approximately 14 large fish on board that were consistent with the size of fish professional fishermen would catch. The LEDET felt that the amount of fish on board the vessel was inconsistent with the time that the vessel has been underway. The large fish (12 shark and 2 mahi mahi) were also frozen solid and already frozen in a decomposing state.

The fish hold was situated so all crewmembers would have access to it. The crew also maintained their own personal food supplies in the refrigerated fish hold area. The LEDET also noted that the condition of the fishing equipment onboard the vessel was in poor condition.

The USCG LEDET 104 conducted a space accountability on board the vessel and discovered that approximately 7% of the ship's space was unaccounted for. Members of the USCG Cutter "Active" then conducted soundings of the various fuel tanks on board the vessel and discovered a substance other than fuel in one of the fuel tanks. On May 3, 2001, the USCG Cutter "Active" crew discovered approximately 12 metric tons of a substance that field-tested positive for cocaine, secreted in the fuel tank of the vessel "SVESDA MARU".

The USCG Cutter "Active" crew subsequently seized the "SVESDA MARU" pursuant to the bi-lateral treaty with Belize and with the express permission of the government of Belize. At the time of the boarding ten crewmen were found on the vessel. The ten subjects were identified as follows: Victor SAVCHENKO (Captain), Mykola IHNATENKO, Petr SHISHKOVSKY, Mykhailo YURCHENKO, Alexandre CHAGOVIK, Anatoli ZAKHAROV, Oleksandr KURYS, Yevgen KURYS, Volodymyr CHAPNY, Pavel RYMAREV. Passports for three of the crew members indicate that YURCHENKO, IHNATENKO and ZAKHAROV had all been crew members on board the fishing vessel "Forever My Friend" during 1999. The US Coast Guard seized the "Forever My Friend" during February 2001, when approximately 8 metric tons of cocaine was discovered on board.

On May 13, 2001, the ten defendants listed above entered the United States at San Diego, California and were arrested by the DEA for violation of title 46, United States Code Appendix, Section 1903 (a), (c)(1)(C),(f) and (j).

A further search of the vessel revealed the electronic equipment listed in paragraph 2 of attachment A. Experts with the United States Drug Enforcement Administration were consulted and told me that valuable evidence can be retrieved from the electronic equipment. This evidence would include way points and other data that recreate the route the vessel took. Evidence obtained from the communication equipment could also assist to identify other suspects.

The electronic equipment listed above has been removed from the "SVESDA MARU" and is currently in the custody of the U.S. Drug Enforcement Administration in San Diego.

D. CONCLUSIONS:

1. Based upon my experience and training, consultation with other Special Agents and Law Enforcement Officers experienced in drug investigations and all the facts and opinions set forth in this affidavit, I know that:

   a. Individuals responsible for transporting drugs by boat utilize Long Range Navigational equipment (LORAN), Satellite Navigation Equipment (SATNAV), radios, and Global Positioning Equipment (GPS) in order to coordinate rendezvous points where drugs are transferred from one boat to another vessel.
   b. Individuals involved in drug transportation often maintain on their vessels logs and charts in order to keep track of the directions, times and locations for loading and off-loading of drugs. These records are often maintained not only on paper, but also as electronic data in the form of computer hardware, computer software, radar equipment memory, LORAN equipment memory, SATNAV equipment memory, GPS equipment memory, and other related equipment.
   c. Individuals involved in drug transportation often must communicate with on-load and off-load vessels via radio and cellular telephone equipment. Radio and cellular telephone equipment are often programmed with frequencies and telephone numbers.
   d. Individuals involved in transporting drugs by boat utilize electronic equipment designed to detect the presence of Coast Guard and U.S. Navy vessels and to intercept communications of the Coast Guard and Navy or law enforcement activities including radar and scanners.
   e. Individuals involved in the distribution of drugs maintain documents and computer information which memorialize the transportation and sale of drugs; including buyers lists, sellers lists, records of sales, log books, drug ledgers, computers and computer equipment, computer software, personal telephone/address books, including electronic organizers and rolodexes.
   f. Individuals involved in drug transportation, take or cause to be taken, photographs of themselves, their associates, their property and their drugs, and usually maintain these photographs in their possession on the vessel.

   Based upon my experience and training, consultation with other Special Agents and Law Enforcement Officers experienced in drug investigations, and all the facts and opinions set forth in this affidavit, I believe that the items set forth in Attachment A, and which are evidence of violations of Title 46, United States Code, Sections 1903(a), (c)(1)(C),(f) and (j) (Possession of Cocaine with Intent to Distribute on Board A Vessel), will be found on the vessel to be searched, found on the Application for Search Warrant.

E. SEARCH REQUESTS:

   Based on your affiant's knowledge, training and experience, your affiant knows that searching and seizing information from computers and electronic equipment often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because of the following:

(1) <u>The Volume of Evidence</u>.  Computer storage devices (like hard disks, diskettes, tapes, laser disks) can store the equivalent of millions of pieces of information.  Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive files names.  This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime.  This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

(2) <u>Technical Requirements</u>.  Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and it's data.  In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden", erased, compressed, password-protected, or encrypted files.  Because computer evidence is vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive codes imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis.  Further, such searches often require the seizure of most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.

In light of these concerns, your affiant hereby requests the Court's permission to seize the computer hardware (and associated peripherals) and the equipment listed in Attachment A that are believed to contain some or all of the evidence described in the warrant and to conduct an off-site search of the hardware for the evidence described.

_____
Susan M. Wolf
Special Agent, DEA

SWORN and SUBSCRIBED to before me
This __29__ Day of ~~March~~ May 2001.

_____
UNITED STATES MAGISTRATE JUDGE

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

*In the Matter of the Search of*

**Fishing Vessel "SVESDA MARU", Registered in Belize, 152' ft, White Hull w/White Trim, Homeport Guayaquil, EU, Callsign 029920145**

*SEARCH WARRANT*

CASE NUMBER: '01 ___ 1356

TO: *Any Special Agent of the Drug Enforcement Administration* and any Authorized Officer of the United States

*Affidavit(s) having been made before me by* Susan Wolf
*who has reason to believe that* ☐ *on the person or* X *on the premises known as*

See *Attachment A*

*in the Southern District of California, there is now concealed a certain person or property, namely*

See *Attachment B*

*which is the fruits, instrumentalities and evidence concerning a violation of Title* __46__ *United States Code, Section(s)* 1903(a), (c)(1)(c), (f) and (j)

*I am satisfied that the affidavits(s) and any recorded testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.*

**YOU ARE HEREBY COMMANDED** *to search on or before* __6-8-01__
                                                        Date

*(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search* ☐ *(in the daytime - 6:00 A.M. to 10:00 P.M.)* ☒ *(at any time in the day or night as I find reasonable cause has been established) and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to the issuing U.S. Magistrate Judge, as required by law.*

__5/29/01__                                       at    __San Diego, California__
Date/Time issued


__Larry Burns__
**United States Magistrate Judge**                        *Signature of Judicial Officer*

ATTACHMENT A

DESCRIPTION OF CONCEALED PROPERTY, NAMELY:

1. Equipment used for navigational purposes, including Global Positioning Systems (GPS), Long Range Navigational Equipment (LORAN), and Satellite Navigational Equipment (SATNAV).

2. All documents, information and electronic data relating to positions reached and/or courses taken by the vessel, including logs and charts, electronic data in the form of computer hardware, computer software, radar equipment memory, LORAN equipment memory, SATNAV equipment memory, and GPS equipment memory, in all communication and navigation equipment to include:

```
Furuno       GD-185        Color Plotter           2413-1533
Furuno       FS-1501       SSB Transceiver         5586-1340
Furuno       FS-1503       SSB Transceiver         3513-0473
Furuno       FS-1200       SSB Radio Telephone     533-0564
Furuno       GP-31         GPS                     3426-4989
Furuno       GP-1610C      GPS Plotter             2495-4667
Furuno       FM-2711       VHF/FM Radio Telephone  3510-0558
Furuno       FAX-208A      Facsimile Receiver      80516621-9408
Kenwood      TM-733A       FM Dual Bander          60902654
Panasonic    KX-G2200      VHF Radio Telephone     1LBQB006592
Panasonic    KX-FP200LA    Facsimile               7IAFA005175
Nera         Saturn M      Inmarsat-M Phone        2808
Nera         Worldphone    Powersupply             00070085
Grundig      Yacht Boy 400    SSB Receiver         No Identifiable SN
JRC Beacon   Emergency Position Indicating Radio Beacon   NO SN
COMSAT Mobile Communications Card (INMARSAT Phone Card)
Furuno       Coastline Data Card  for Mexico and Central America   Stock # J3518
Furuno       Coastline Data Card for Andalucia    Stock # ESP06ET3
Furuno       Coastline Data Card  for Eucuador    Stock # ECU01ES3
Maxell Disk 2000 Point Coastline Data for Eucador    Stock # EC002
Maxell Disk        Unknown                  -      Stock # JF14-02
Maxell Disk        Unknown                         Unknown
```

3. Communications equipment, including radios, cellular telephones, computers, and facsimilie machines.

4. Equipment used to detect U.S. Coast Guard and U.S. Navy activities and surveillance, including radio scanners and radar detectors.

5. Tracking equipment, including radar, tracking devices and related electronic

or computer equipment.

6. COMPUTER EQUIPMENT/ELECTRONIC EVIDENCE -

(a) Items to be seized as instrumentalities:

(1) Computer hardware is described as any and all computer equipment, including any electronic devices which are capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical, or similar computer impulses or data.  These devices include, but are not limited to, any data-processing hardware (such as central processing units and any of the items listed in paragraph 2 above), internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, and other memory storage devices), peripheral input/output devices (such as keyboard, printers, scanners, plotters, video display monitors, and optical readers), and related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices), as well as any devices, mechanisms, or parts that can be used to restrict access to such hardware (such as physical keys and locks) or to ensure that it has an uninteruptable power supply.

(2) Computer software is described as any and all information, including any instructions, programs, or program code, stored in the form of electronic, magnetic optical, or other media which are capable of being interpreted by a computer or it's related components.  Computer software may also include certain data, data fragments or control characters integral to the operation of computer software.  These items include, but are not limited to, operating system software, applications software, utility programs, compilers, interpreters, communications software, and other programming used or intended for use to communicate with other computer components.

(3) Computer-related documentation is described as any written, recorded, printed or electronically-stored material which explains or illustrates the configuration or use of any seized hardware, software, or related items.

(4) Computer passwords and data security devices are described as all those devices, programs, or data -- whether themselves in the nature of hardware or software that can be used or is designed for use to restrict access to or facilitate concealment of any computer hardware, computer software, computer-related documentation, electronic data, records, documents or materials within the scope of this application.  These items include, but are not limited to, any data security hardware (such as any encryption devices, chips and circuit boards), passwords, data security software or information (such as test keys and encryption codes), and similar information that is required to access computer programs or data or to otherwise render programs or data into a useable form.

(5) Based on the probable cause established in Attachment B, the above mentioned computer hardware, software, computer documentation, passwords and data security devices constitute means of committing criminal offenses, and are thus instrumentalities in, as well as evidence of, the violations recited herein.  These materials are therefore subject to seizure pursuant to Rule 41 of the Federal Rules of Criminal Procedure, and may be retained as evidence and as instrumentalities used in the commission of a crime for a reasonable period of time and may be examined, analyzed, and tested as evidence and instrumentalities used in the commission of a crime for a reasonable period of time.

b. Items to be seized as evidence.

(1) In addition to its use of its computers as instrumentalities of criminal offenses, I know that the premises to be searched used their computers and related electronic storage devices to collect, store, maintain, retrieve, conceal, transmit, and use electronic data in the form of electronic records, documents, and materials, including those used to facilitate communications. This data may be more fully described as any information stored in the form of electronic, magnetic, optical, or other coding on computer media or on media capable of being read by a computer or computer-related equipment. This media includes, but is not limited to, any fixed disks, external hard disks, removable hard disk cartridges, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, laser disks, or other memory storage devices.

(2) The terms "records, documents, and materials, including those used to facilitate communications" as used above includes all of the foregoing items of evidence in whatever form and by whatever means such records, documents, or materials, their drafts, or their modifications may have been created or stored, including, but not limited to, any handmade form (such as writing, drawing, painting, with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any mechanical form (such as phonograph records, printing, or typing); any electrical, electronic, or magnetic form (such as tape recordings, cassettes, compact discs), or any information on an electronic or magnetic storage device (such as floppy diskettes, hard disks, CD-ROMs, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks), as well as printouts or readouts from any magnetic storage device.

(3) The terms "records, documents, and materials, including those used to facilitate communications" as used above shall also be read to include any and all electronic information or electronic data, store in any form, which is used or has been prepared for use either for periodic or random back-up (whether deliberate or inadvertent, or automatically or manually initiated), of any computer or computer system. The form such information might take includes, but is not limited to, floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, video cassettes, and other media capable of storing magnetic or optical coding.

(4) Such electronic data in the form of electronic records, documents, and materials, including those used to facilitate communications constitutes evidence of the commission of a criminal offense. These materials are therefore subject to seizure pursuant to Rule 41 of the Federal Rules of Criminal Procedure, and the devices used to store or facilitate storage of such materials may be retained as evidence in the commission of a crime for a reasonable period of time and may be examined, analyzed, and tested for a reasonable period of time as evidence in the commission of a crime.

## ATTACHMENT B

I, Susan Wolf, Special Agent, United States Department of Justice, Drug Enforcement Administration, being duly sworn, hereby depose and say:

A. INTRODUCTION:

1. I am a Special Agent with the Drug Enforcement Administration (DEA) assigned to the San Diego Field Division. I have approximately 5 years of law enforcement experience in Southern California. I have been employed by DEA as a Special Agent for approximately five years. Prior to that I was an Intelligence Research Specialist for DEA, for approximately four and a half years.

2. While employed by the DEA, I attended a seventeen-week course at the DEA Academy in Quantico, Virginia. During this course, I have received formal training in the identification of various types of controlled substances by sight and odor, the way in which controlled substances are packaged, marketed, and consumed, and the effects of various drugs on human physiology. I have also received formal training that focused on the transportation and distribution of controlled substances. This training included identification of packaging and concealment techniques used by persons involved in the transportation and distribution of controlled substances.

3. During five years of Southern California Law Enforcement, I have conducted numerous investigations that would be violations of Title 21, and have made numerous arrests for the same. I have participated in many aspects of drug investigations, to include acting as an undercover agent, case agent, being a contact for confidential sources, conducting surveillance, and executing numerous arrest and search warrants.

4. I have talked to individuals who have been involved in the use sales, and the illegal distribution of controlled substances. I have learned from those individuals the techniques commonly used by those involved in the distribution and packaging of controlled substances. I have worked with Cooperating Sources of Information (CSs) and have learned from CSs the ways in which narcotic traffickers operate.

5. Because of my personal participation in this investigation, and because of information provided to me by other agents and officers, I am familiar with the facts and circumstances of this investigation. My experience in investigating drug offenders, my education, my conversations with other drug agents, and my specialized training formed the basis for the opinions and conclusions set forth, below which I drew from the facts set forth herein.

B. VESSEL TO BE SEARCHED:

I believe that I have probable cause to search:

The Fishing Vessel "SVESDA MARU", registered in Belize with the call sign 029920145, length: approximately 152 feet, color: white hull with white trim, homeport: Guayaquil, Ecuador; including the items listed in Attachment A.

C. FACTS:

On or about April 28, 2001, a United States Navy (USN) Ship, with United States Coast Guard (USCG) Law Enforcement Detachment (LEDET) #104 were on routine patrol in international waters, approximately 500 nautical miles off of the coast of Acapulco, Mexico. The USCG LEDET #104 conducted a boarding of a Belizian flagged, 152 foot fishing vessel, named "SVESDA MARU". The 'SVESDA MARU" crew claimed that they had been underway since approximately April 21, 2001, on a fishing trip.

The LEDET noted that there was several hundred pounds of small fish (squid etc.) that is commonly used as fishing bait. The bait, however, was frozen solid and did not appear to have been disturbed in some time. There were only approximately 14 large fish on board that were consistent with the size of fish professional fishermen would catch. The LEDET felt that the amount of fish on board the vessel was inconsistent with the time that the vessel has been underway. The large fish (12 shark and 2 mahi mahi) were also frozen solid and already frozen in a decomposing state.

The fish hold was situated so all crewmembers would have access to it. The crew also maintained their own personal food supplies in the refrigerated fish hold area. The LEDET also noted that the condition of the fishing equipment onboard the vessel was in poor condition.

The USCG LEDET 104 conducted a space accountability on board the vessel and discovered that approximately 7% of the ship's space was unaccounted for. Members of the USCG Cutter "Active" then conducted soundings of the various fuel tanks on board the vessel and discovered a substance other than fuel in one of the fuel tanks. On May 3, 2001, the USCG Cutter "Active" crew discovered approximately 12 metric tons of a substance that field-tested positive for cocaine, secreted in the fuel tank of the vessel "SVESDA MARU".

The USCG Cutter "Active" crew subsequently seized the "SVESDA MARU" pursuant to the bi-lateral treaty with Belize and with the express permission of the government of Belize. At the time of the boarding ten crewmen were found on the vessel. The ten subjects were identified as follows: Victor SAVCHENKO (Captain), Mykola IHNATENKO, Petr SHISHKOVSKY, Mykhailo YURCHENKO, Alexandre CHAGOVIK, Anatoli ZAKHAROV, Oleksandr KURYS, Yevgen KURYS, Volodymyr CHAPNY, Pavel RYMAREV. Passports for three of the crew members indicate that YURCHENKO, IHNATENKO and ZAKHAROV had all been crew members on board the fishing vessel "Forever My Friend" during 1999. The US Coast Guard seized the "Forever My Friend" during February 2001, when approximately 8 metric tons of cocaine was discovered on board.

On May 13, 2001, the ten defendants listed above entered the United States at San Diego, California and were arrested by the DEA for violation of title 46, United States Code Appendix, Section 1903 (a), (c)(1)(C),(f) and (j).

A further search of the vessel revealed the electronic equipment listed in paragraph 2 of attachment A. Experts with the United States Drug Enforcement Administration were consulted and told me that valuable evidence can be retrieved from the electronic equipment. This evidence would include way points and other data that recreate the route the vessel took. Evidence obtained from the communication equipment could also assist to identify other suspects.

The electronic equipment listed above has been removed from the "SVESDA MARU" and is currently in the custody of the U.S. Drug Enforcement Administration in San Diego.

D. CONCLUSIONS:

1. Based upon my experience and training, consultation with other Special Agents and Law Enforcement Officers experienced in drug investigations and all the facts and opinions set forth in this affidavit, I know that:

    a. Individuals responsible for transporting drugs by boat utilize Long Range Navigational equipment (LORAN), Satellite Navigation Equipment (SATNAV), radios, and Global Positioning Equipment (GPS) in order to coordinate rendezvous points where drugs are transferred from one boat to another vessel.
    b. Individuals involved in drug transportation often maintain on their vessels logs and charts in order to keep track of the directions, times and locations for loading and off-loading of drugs. These records are often maintained not only on paper, but also as electronic data in the form of computer hardware, computer software, radar equipment memory, LORAN equipment memory, SATNAV equipment memory, GPS equipment memory, and other related equipment.
    c. Individuals involved in drug transportation often must communicate with on-load and off-load vessels via radio and cellular telephone equipment. Radio and cellular telephone equipment are often programmed with frequencies and telephone numbers.
    d. Individuals involved in transporting drugs by boat utilize electronic equipment designed to detect the presence of Coast Guard and U.S. Navy vessels and to intercept communications of the Coast Guard and Navy or law enforcement activities including radar and scanners.
    e. Individuals involved in the distribution of drugs maintain documents and computer information which memorialize the transportation and sale of drugs; including buyers lists, sellers lists, records of sales, log books, drug ledgers, computers and computer equipment, computer software, personal telephone/address books, including electronic organizers and rolodexes.
    f. Individuals involved in drug transportation, take or cause to be taken, photographs of themselves, their associates, their property and their drugs, and usually maintain these photographs in their possession on the vessel.

    Based upon my experience and training, consultation with other Special Agents and Law Enforcement Officers experienced in drug investigations, and all the facts and opinions set forth in this affidavit, I believe that the items set forth in Attachment A, and which are evidence of violations of Title 46, United States Code, Sections 1903(a), (c)(1)(C),(f) and (j) (Possession of Cocaine with Intent to Distribute on Board A Vessel), will be found on the vessel to be searched, found on the Application for Search Warrant.

E. SEARCH REQUESTS:

   Based on your affiant's knowledge, training and experience, your affiant knows that searching and seizing information from computers and electronic equipment often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because of the following:

(1) <u>The Volume of Evidence</u>. Computer storage devices (like hard disks, diskettes, tapes, laser disks) can store the equivalent of millions of pieces of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive files names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

(2) <u>Technical Requirements</u>. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and it's data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden", erased, compressed, password-protected, or encrypted files. Because computer evidence is vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive codes imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis. Further, such searches often require the seizure of most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.

In light of these concerns, your affiant hereby requests the Court's permission to seize the computer hardware (and associated peripherals) and the equipment listed in Attachment A that are believed to contain some or all of the evidence described in the warrant and to conduct an off-site search of the hardware for the evidence described.

Susan M. Wolf
Special Agent, DEA

SWORN and SUBSCRIBED to before me
This 29 Day of M~~arch~~ May 2001.

UNITED STATES MAGISTRATE JUDGE